Den ex Dem. Wooden v. Shotwell.

---

DEN EX DEM. RICHARD WOODEN v. JOSEPH L. SHOTWELL.

1. If a tract of land be divided into lots of greatly unequal value, and a right to have one of these lots be sold to a number of purchasers, at a uniform price, upon the understanding that they are to be distributed by drawing or lot, and they are so distributed and a deed given to each purchaser for the lot so drawn by him, the transaction is a lottery, and the deed is void and conveys no title. The parties in such case never were tenants in common, and the whole title is founded upon an illegal transaction.

2. In such case the grantor, although *particeps criminis,* claiming under his prior untainted title, is not prohibited from setting up the illegality of the lottery transaction against the deed given by himself. The statute declares such deed *void.* It is a nullity, and needs no action of court to avoid it.

---

The writ of error in this case was to the Supreme Court, and was brought to reverse the judgment in that court. The state of the case is given at length in the report of the decision in the Supreme Court, 3 *Zab.* 466.

The cause in the Court of Errors was argued by Mr. *Whitehead* and Mr. *Vroom* for the plaintiffs, and Mr. *William Halsted* and Mr. *G. H. Brown* for the defendant.

The opinion of the court was delivered by

OGDEN, J. This cause comes before us by a writ of error to the Supreme Court. An action of ejectment was commenced in that tribunal, and the issue of not guilty was

taken down to the county of Somerset for trial. The state of facts agreed upon by the attorneys of the parties, in the nature of a special verdict, for the opinion of the court at bar as to the plaintiff's right of recovery, shows that the lessor of the plaintiff, in November, 1835, being the owner in fee of a tract of land in the township of Warren, in the county of Somerset, mapped it into fifty-eight lots; and in pursuance of an arrangement made by him for the sale of the lots, he subsequently made deeds for fifty-seven of them to the purchasers thereof; that a deed was thus made for the premises in question, to the plaintiff in error, who took and has since held them in possession, although he afterwards conveyed them to his son Alexander, and has from that time occupied them as his son's tenant; and that Alexander had full notice of the arrangement for the disposal of the fifty-seven lots before he took his deed.

The lessor of the plaintiff relies upon his *original* title as the *ground for a recovery*, insisting that his whole arrangements and proceedings for the sale of his lots were made and executed in violation of a statute of New Jersey, passed for " the suppression of lotteries ;" and that his deed to the plaintiff in error is invalid and void.

. The important question for the determination of this court is, whether the deed of the 19th of November, 1835, executed by the lessor of the plaintiff to the plaintiff in error, was made in pursuance of a lottery transaction ? If it was, the language of the fourth section of the " act for the suppression of lotteries," gives it an impress too plain to be misunderstood. It declares every such sale, conveyance or transfer of real estate, to be invalid and void.

It is a self-evident proposition, that where the law declares a contract to be void, a party can acquire no legal right under or by virtue of it.

A portion of the argument, made in behalf of the plaintiff in error, was directed to the enforcement of this legal maxim —that where parties to a suit are " *in pari delicto, potior est conditio possidentis.*" Or, in other words, by an application of the maxim to this case, that, as the lessor of the plaintiff

originated and contrived the unlawful scheme, (if it was unlawful,) he ought not to be permitted to avail himself of that transaction in a court of justice, to maintain his own title, by defeating with it the title claimed and set up by the plaintiff in error.

The principle is correct, that a court of justice will not assist a suitor in obtaining possession of property, when his right thereto grows directly out of an immoral or illegal transaction. A party should come into court with clean hands, to invoke its aid.

The law will not help an individual in enforcing a *demand* originating in a breach or violation on his part, of *its* principles or enactments.

Courts will not aid a person whose cause of action, either upon his own showing or otherwise, appears to arise *ex turpi causa*, or from the transgression of positive law. They do not adopt this policy for the purpose of protecting a defendant, but from a determination not to assist *such* a plaintiff.

But the difficulty of applying the rule to the case before us, in the concise and strong language of the Chief Justice, lies here—" Neither the lessor of the plaintiff's title to the land, nor his *right* of recovery, is in anywise founded upon the illegal transaction. He shows a valid title to the land prior to and independent of the existence of the lottery, to *support his action;* he shows his documentary title, but offers no evidence of the existence of the lottery."

*That* feature of the case was first disclosed through the defence. The plaintiff in error, in support of his possession, produced his deed to his son Alexander, dated the fourteenth of April, 1841, and also the deed to himself, from the lessor of the plaintiff, dated the nineteenth of November, 1835, both having been duly recorded. They are in common form, and make no reference to the manner in which the lot was disposed of by the first grantor. If the deed of November, 1835, conveyed the title out of the grantor, the case was well defended, and the judgment should have been for the plaintiff in error, upon the maxim, "*potior est conditio possidentis.*"

The lessor of the plaintiff would, in such case, have been restrained from seeking to invalidate that title by showing that the transaction out of which it grew, was either immoral or contrary to positive law. The contract would have been executed, and not being in itself fraudulent as to third persons, it could not, on the principles of the common law, have been impeached by the grantor, on the ground of its impure origin. The law leaves parties who are in *pari delicto*, as it finds them; and in the words of Mr. Justice Baldwin, in the case of *Bartle* v. *Coleman*, "if either has sustained *loss* by the bad faith of his *particeps criminis*, it is but a just infliction for a premeditated illegal advantage."

But the question still lying behind in this case, is this: If the deed from the lessor of the plaintiff to the plaintiff in error, originated in a lottery, could it pass any title to the premises in question? It differs from a deed made in contravention of the *statute to prevent frauds*. *That* act was designed to protect creditors against fraudulent conveyances by their debtors; and it provides that certain alienations, made for intents and purposes therein expressed, shall be taken as against the parties intended to be defrauded, to be utterly void, frustrate and of no effect. The conveyance, as between the parties to it, is left under the control of the common law.

A title having passed by the voluntary act of the grantor, he is estopped from impeaching it by the maxim, "*potior est conditio possidentis.*" If that statute, instead of confining the benefit of its penalty to creditors sought to be defrauded, had simply declared all such covenous alienations to be void, such provision would have changed the common law, by avoiding executed contracts, and no titles would pass under such conveyances.

The " act for the suppression of lotteries," contains an express provision of that kind. The fourth section, upon which the question arises, enacts, "that every grant, bargain, sale conveyance or transfer of any goods, chattels, lands, tenements, hereditaments or real estate, which shall be made in pursuance of any such lottery, is hereby declared to be

invalid and void?" How is the intent of the legislature to be carried out, if a conveyance, such as that section contemplates, is not treated as an absolute nullity? How can the hidden conception be exposed, and the positive enactment against it have its legitimate influence, if the grantor be not permitted to disclose its conception and birth? It is not to be overlooked, that the law invests sealed instruments with much solemnity; and that in many cases it prevents a person from gainsaying the effect of his voluntary deed. But the principles from which these rules spring, cannot be applied to the case before us. The lessor of the plaintiff seeks to subvert the defence, by showing that the sealed instrument upon which it is rested, was founded on a transaction prohibited by a positive law of this state, and by *that* law declared to be invalid and void.

No principle of justice or of sound morals nor rule of policy should prevent a grantor from showing his deed to be fraudulent or illegal. In many cases, such proof would be the only means of giving effect to prohibitory enactments, and of attaining their beneficial objects. The court below were not asked in this case to *declare the deed void*, thereby admitting its vitality till such sentence should be pronounced: but they were called on to give effect to testimony, which established the contention of the lessor of the plaintiff, that the instrument was, by force of statutory enactment, made invalid and void *ab initio*. If such was its character, no title or valid delivery of possession could pass under it; and hence the fee and right of possession must have remained in the grantor. His right to recover in the action was complete, upon the production and proof of his original conveyance; and he was not driven for aid in *establishing his case*, to an illegal transaction.

It is true, that an objection of this kind comes ill from a party occupying the position of this lessor; it should, however, be borne in mind, that it is not allowed for *his* sake, but is founded on general principles of sound policy, which he, accidentally as it were, may reap the advantage of, contrary perhaps to substantial justice between him and the

plaintiff in error. Principles of general convenience often demand that the strict justice of a case, as respects the parties, shall give way to the higher considerations of the effect of the point involved on public morals and the public interests.

If the arrangement for the disposal of the lots was in contravention of the statute of New Jersey, for the suppression of lotteries, the Supreme Court committed no error, in ruling that the lessor of the plaintiff could go behind his deed and show its illegality.

But, was the conveyance from Wooden to Shotwell made in pursuance of a lottery transaction?

By the case it appears that the plot of land was divided into fifty-eight lots; and it sets out that Wooden *sold* fifty-seven of them to different persons, and took from each purchaser a promissory note for the payment of seventy-five dollars, but that he did not at the time give any deed for the lots. That it was then understood and agreed, by and between him and the persons who had taken the fifty-seven lots, that the location of each purchaser's lot, as well as of his own, should be determined by putting the number of each lot on separate pieces of paper in a box, and the names of the different persons in another box; that the names and numbers should be drawn out by indifferent persons, to be selected by Wooden and the purchasers; that such drawing should determine the location of each purchaser's lot as well as his own; and that after the drawing, he would make deeds for the numbers of the lots then drawn by the respective purchasers. It further appears, that in pursuance of the arrangement, a drawing was had in the manner above stated; and that deeds were made to the purchasers for the lots drawn by them; that the fifty-eight lots were of unequal value; lot No. one, which was drawn by the plaintiff in error, (embracing the premises in question in this cause,) being considered worth at least six hundred dollars; another lot being considered worth at least three hundred dollars, and a few lots being considered worth not over fifty dollars. It was earnestly contended in behalf of the plaintiff in

error, that the purchasers and Wooden were tenants in common of all the land, and that the plan adopted was merely to make *partition* between them. The language employed in the state of the case was relied on to sustain that contention. But the statement of the case examined as a whole, shows that the assumption is not *true*. Although it sets out that Wooden *sold* fifty-seven of the lots, yet from the same sentence it appears that he did not, at the time of making the alleged sales, or before the drawing took place, give any deeds for the lots. It was not until after that drawing was had, that a purchaser obtained his right to any part of the land, or had any vested existing interest in it. Then he acquired a right to a lot in severalty, and his first seizin (if the transaction was lawful) was in severalty by virtue of his deed.

Tenants in common are seized of the whole estate ; before partition, the *title* is in them ; and the object of the lot is to determine for each his particular equal share as near as may be of the whole.

The cases are entirely dissimilar.

To test the character of the mode devised by Wooden, for the disposal of his property, it is important that we understand the motives of the respective parties to the agreement.

What prompted Wooden to adopt that plan ?

Was it not the expectation, that the prospect of large gain, by the result of a chance drawing, would induce persons to hazard seventy-five dollars *for* the chance ?

Again—What led the purchasers to invest in the enterprize ?

Was it not the hope of obtaining, through the mere agency of chance, a valuable house and lot, or a lot much exceeding in value the sum of money promised to be paid ?

If the plan was thus originated and executed, it was a contrivance for the distribution of prizes by chance ; a reliance upon the result of hazard ; a decision of the values of the adventurers' investments by the favors of fortune.

Is not such a device a lottery ? Does it not engender that imprudent spirit of gambling which the prospect of adven-

titious gain usually excites ?   Has it not a direct tendency to produce those pernicious mischiefs in a community which the "act for the suppression of lotteries" was intended to prevent?  I can conceive of but one honest answer to these queries.

The whole contrivance was a lottery transaction, and is directly in the face of the provisions of a statute of our state.

This conclusion, however hard it may bear upon some parties, who claim title to lots through that medium, is fully supported by the cases of *Seidenbender and others against the administrators of Joseph Charles,* in 4 *Sergt. & Rawle, p.* 151, of *Ridgeway* v. *Underwood,* determined in the circuit court of the United States, held in this state, reported in 4 *Wash. C. C. Reps., p.* 129 ; and of *Thorn & Cosy* v. *Wooden,* disposed of in the Supreme Court of this state, in April, 1850, on a *certiorari* to the court of common pleas of the county of Essex.

The judgment below must be affirmed with costs.

*For Affirmance*—THE CHANCELLOR, and Judges HAINES, OGDEN, HUYLER, RISLEY, and WILLS.

*For Reversal*—Judge ARROWSMITH.

Judgment affirmed.

CITED *in* Huncke v. *Francis,* 3 *Dutch.* 67 ; *Mulford* v. *Peterson,* 6 *Vr.* 134.